J-A17022-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 827 EDA 2022 |

Appeal from the Order Entered March 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000699-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: E.D.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 828 EDA 2022 |

Appeal from the Decree Entered March 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000124-2022

BEFORE:   PANELLA, P.J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 14, 2022**

N.T. (Father) appeals from the decree and order granting the petitions filed by the Philadelphia County Department of Human Services (DHS), involuntarily terminating his parental rights to his minor son, E.G (Child), and

---

[*] Retired Senior Judge assigned to the Superior Court.

changing Child's permanency goal to adoption.[1]  Father argues that the trial court erred in concluding that DHS presented clear and convincing evidence supporting the termination of his parental rights and in changing Child's permanency goal to adoption.  We affirm.

The facts underlying this matter are well known to the parties.  On March 20, 2017, DHS obtained an order of protective custody (OPC) for Child after receiving reports that Mother had abandoned him with his maternal grandmother.  ***See*** N.T Hr'g, 3/15/22, at 14-15.  At that time, Father's whereabouts were unknown.  ***Id.***

The trial court held a shelter care hearing on March 22, 2017, at which time Father was granted supervised visitation with Child.  ***See*** Shelter Care Order, 3/22/17, at 1.  On July 13, 2017, the trial court adjudicated Child dependent.  ***See*** Order of Adjudication, 7/13/17, at 1.  At the time of the dependency hearing, Father was incarcerated.  ***See id.***  Nevertheless, the court granted Father biweekly supervised visitation with Child.  ***See id.***

Throughout the pendency of the case, the trial court held regular permanency review hearings for Child.  The court ordered Father to participate in drug and alcohol treatment, parenting classes, and domestic violence services, either while incarcerated or upon his release.  Father did not provide proof of completion for any of his permanency goals.

---

[1] On December 17, 2021, S.G. (Mother) signed the petition to voluntarily relinquish her parental rights to Child.  Trial Ct. Op., 9/27/22, at 1.  The trial court accepted the petition on March 15, 2022. ***See id.***  Mother did not file a separate appeal and is not a party to the instant appeal.

On February 25, 2022, DHS filed a goal change petition and a petition seeking the involuntary termination of Father's parental rights. The trial court held a combined termination and goal change hearing on March 15, 2022.[2] DHS presented the testimony of Community Umbrella Agency (CUA) case manager Beverly Jackson, and A.B., Child's foster parent. Father testified on his own behalf.

Ms. Jackson testified that throughout the history of the case, Father's single case plan objectives remained the same: maintain communication with CUA, attend parenting classes and drug and alcohol treatment, and remain consistent with visitation. N.T. Hr'g, 3/15/22, at 16. Ms. Jackson also stated that she personally provided Father and his prison counselor with her contact information, and that the address and phone number for CUA did not change at any point during the case. *Id.* at 20-22. However, Ms. Jackson stated that Father contacted her only one time and did not send letters or gifts for Child. *Id.* at 21-26.

---

[2] Jay Stillman, Esq., served as Child's guardian *ad litem* (GAL) throughout the proceedings. Attorney Stillman argued that terminating Father's parental rights was in Child's best interests. N.T. Hr'g, 3/15/22, at 2-6, 47-48. Regina Charles-Asar, Esq., served as Child's legal counsel during the termination proceedings, and appeared at the hearing on his behalf. *See id.* at 2-6; *see also In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020). Attorney Charles-Asar testified that Child was too young to give a preferred outcome and did not understand adoption. N.T. Hr'g, 3/15/22, at 34. However, during her meetings with Child, she observed that Child considered his foster family his family and home, he was comfortable and bonded with his foster family members, and he referred to his foster parent as "Mom." *See id.*

Ms. Jackson also testified that she made "multiple attempts in trying to get [Child] to have a virtual visit with [Father]" while Father was incarcerated at SCI Benner, and she explained that it was "difficult to get through to anyone" at the prison. *Id.* at 24. However, Ms. Jackson testified that even after Father was released from prison, he did not consistently attend supervised visitation with Child or complete his other objectives such as parenting, housing, and drug and alcohol treatment. *Id.* at 17-18.

Ms. Jackson stated that she did not believe that Child shared a parental bond with Father. *Id.* at 23. Child never asked about Father, and in the five years that Child has been in care, Father did not provide any meaningful care to him. *Id.* Child has lived with his pre-adoptive foster parent, A.B., since June 2018 and shares a parental bond with her. *Id.* at 22. A.B. provides for all of Child's needs and has created a nurturing environment for him. *Id.* at 23-28. Ms. Jackson did not believe Child would suffer irreparable harm from the termination of Father's parental rights but would suffer harm if he were removed from A.B.'s care. *Id.* at 26.

A.B. testified that Child has lived with her since he was seventeen months old. *Id.* at 31. During this time, Father attended two or three supervised, one-hour visits with Child. *Id.* at 31-32. A.B. wishes to adopt Child, and Child refers to A.B. as "Mom." *Id.* at 33.

Father testified that he was incarcerated at the time of Child's birth until early 2017. *Id.* at 36. A few months after his release, Father was again arrested and incarcerated for an additional three years. *Id.* Father was

released in early 2021 and arrested again a few months later. *Id.* At the time of the termination hearing, Father was incarcerated with a minimum release date of October 23, 2022, and maximum release date of April 23, 2023. Father admitted that he had been out of prison for only six or seven months during Child's life. *Id.* at 36-37.

> When asked about the frequency of his visits with Child, Father testified:

> Well, from the point I got locked up in October,[3] I was in contact with [Child's] mother, [who] was doing visitation on Thursdays. I would set it up to where I would be able to get on the phone or I would do video visitations with her and I would be able to communicate with [Child] like that. I would be able to talk to him through video visitation with her. And I was doing -- whenever she would get him, I would call her at the time and do a video visitation and I'd be able to talk to him like that.

*Id.* at 39.

Father stated that when he was incarcerated at SCI Smithfield, he spent thirty days in quarantine, followed by thirty days in solitary confinement, during which time he was unable to speak with anyone. *Id.* Father stated that he was later moved to SCI Benner, where he completed a thirty-day quarantine and then attempted to contact Ms. Jackson about visitation. *Id.* at 39-40.

Father stated that he was aware of the court orders requiring him to complete drug and alcohol counseling and violence prevention classes. *Id.* at 38. Father claimed to be involved in a three-month program called "Thinking

---

[3] It is unclear from the record where Father was incarcerated before he was transferred to SCI Smithfield.

for a Change," and stated that he had previously completed six months of the required treatment. *Id.* However, he acknowledged that SCI Benner did not provide parenting classes. *Id.* When asked whether he faced barriers in communicating with people outside of the prison, Father replied: "No. I have to put numbers on my list . . . . They got to do a background check on that person to be able to get on my phone list. [I] can communicate through personal letters . . . ." *Id.* at 41. Father admitted he had never sent any letters or gifts to Child. *Id.* at 45.

At the conclusion of the hearing, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changed Child's permanency goal to adoption.

Father simultaneously filed a timely notice of appeal and a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Following remand, the trial court issued a Pa.R.A.P. 1925(a) opinion addressing Father's claims.

On appeal, Father raises the following issues, which we have re-ordered as follows:

1. Did the [trial court] err in terminating parental rights where the Commonwealth, in the form of the prison, interfered with Father's ability to communicate with the CUA worker and [Child,] by failing to have telephone systems with voice mail and by failing to set up virtual visits with [Child]?

2. Did the [trial court] err in granting the goal change from reunification to adoption where Father would be released from custody in a few months?

Father's Brief at 7-8 (formatting altered).

**Termination of Parental Rights**

In his first claim, Father challenges the trial court's order involuntarily terminating his parental rights.

We begin by stating our standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted and formatting altered). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

## Section 2511(a)(2)

Initially, we note that Father does not specifically direct his arguments to any specific subsection of the statute. Instead, Father argues that the trial court erred in terminating his parental rights under Section 2511(a). Father's Brief at 26-31. Nevertheless, in support of his challenge to the sufficiency of the evidence supporting the termination of his parental rights, he asserts that SCI Benner failed to provide for "communications between prison staff as well as inmates with outside social workers . . . and failure of the Pennsylvania

prison to provide for visits between prisoners and their children through video." *Id.* at 28. He argues that the prison's failings prevented him from maintaining a relationship with Child. *See id.* at 30. Essentially, Father concludes that the prison prevented him from rectifying his parental incapacity. *See id.*

Section 2511(a)(2) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct.

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being.  Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect.  This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

Thus, while sincere efforts to perform parental duties, can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2).  Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities.  A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (citations omitted and formatting altered).

With respect to incarcerated parents, our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control[,] or subsistence[.]" *In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012) (citation and quotation marks omitted).  Further,

[e]ach case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind . . . that the child's need for consistent parental care and stability cannot be put aside or put on hold.  Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.  Rather, a parent must utilize all

- 10 -

available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Importantly, a parent's recent efforts to straighten out [his] life upon release from incarceration does not require that a court indefinitely postpone adoption.

*Interest of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citations omitted and formatting altered). Additionally, this Court has stressed that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities." *Interest of D.R.-W.*, 227 A.3d 905, 914 (Pa. Super. 2020) (citation omitted and formatting altered).

In the instant case, Child was almost six years old at the time of the termination hearing. *See* N.T. Hr'g, 3/15/22, at 36, 41. During his testimony, Father admitted that he had been incarcerated for all but **six or seven months** of Child's life. Father also testified to his inability to change his ways, noting that he had been incarcerated for the majority of his life from the time he was approximately thirteen years old. *See id.* at 42-43. Father testified that although he had been released from custody several times, he was never "on the street" for more than six months at a time. *See id.* However, even while not incarcerated, Ms. Jackson testified that Father failed to consistently attend visitation, attending only two or three one-hour visits with Child. *See id.* at 17, 31-32.

Further, although both Father and the CUA case manager testified regarding the difficulties of setting up video visitation, the case manager also

testified that Father never wrote letters or cards to Child, sent gifts, or attempted to contact CUA in any other way. *See id.* at 19-26. Although Father claimed that he had written letters to CUA, the trial court credited Ms. Jackson's testimony over Father's. *See id.* at 20-21, 25-26. While Father testified that he had participated in some programming in the prison, as of the date of the termination hearing, he had not provided proof of completion of any of his permanency goals and had never informed his case manager of the same. *See id.* at 20-26, 38-39.

In addressing the termination of Father's parental rights, the trial court emphasized that Father had not consistently visited with Child following his release from prison, and that Father had not cared for Child or spent any time with him outside of a small number of supervised visits. *See id.* at 49-51. Additionally, the court noted that Father contacted his case worker only once, and had never sent cards or letters to Child. *See id.* Although Father testified that he wished to make a change in his life, the court observed that Father had been in and out of prison since the age of twelve and that Child had been in foster care since he was approximately seventeen months old. *See id.*

In its Rule 1925(a) opinion, the trial court explained:

Father's current incarceration and his pattern of incarceration throughout most of [Child's] life is highly relevant to whether Father is presently able to provide [Child] with proper parental care. Nevertheless, Father's incarceration was not the sole reason this Court involuntarily terminated Father's parental rights. While Father has been repeatedly incarcerated throughout the case, there were periods of time when Father was released from incarceration. However, Father failed to engage in his single case plan objectives and failed to consistently visit [Child] while out of

custody. The testimony reflects that Father attended only two or three in-person visits with [Child] throughout the time he was not incarcerated. Father participated in [Child's] adjudicatory hearing and has been aware of his single case plan objectives, yet he failed to complete them.

While there have been some limitations due to Father's incarceration which have affected his ability to complete his SCP objectives, Father failed to make a substantial effort to overcome these obstacles. Ms. Jackson provided Father with her contact information, as well as the contact information and mailing address for the CUA agency. Father could have communicated with CUA by phone or by mail, yet Father failed to maintain consistent contact with CUA throughout the case. Father also failed to maintain meaningful contact with [Child] while in and out of incarceration. He never inquired into [Child's] wellbeing and has never sent [Child] any letters, cards, or gifts throughout the time he has been in care despite having a mailing address and contact information for the CUA agency and case manager. Father was advised to add Ms. Jackson and [Child] to his prison contact list so that he could maintain contact with CUA and visit with [Child], but he failed to do so.

For these reasons, Father has demonstrated that circumstances which brought [Child] into care continue to exist. Father is currently unable to provide proper care for [Child] due to his incarceration. His inaction and lack of meaningful contact in [Child's] life [have] demonstrated that he cannot or will not remedy the conditions which led to placement once he is released from incarceration. Throughout the majority of the case and time that Father has been incarcerated, [Child] has been in the care of his Foster Parent. Foster Parent has been meeting [Child's] basic needs, as well as his medical, emotional, and educational needs. Father has never provided parental care for [Child,] nor has he ever met any of [Child's] needs. Due to Father's repeated incarceration throughout his life, [Child] does not know Father as his father, does not look to him to meet his needs, and is not bonded to Father. [Child] has resided with the Foster Parent for most of his life, and she has essentially been the only parent he has ever known.

The earliest date that Father could be released from SCI Benner is October 23, 2022. However, his maximum release date is October 23, 2024. At the time of the [termination of parental rights (TPR)] hearing in March 2022, Father's parole hearing had

- 13 -

not occurred to determine a definite release date. At the time of the TPR hearing, Father had at least seven more months of incarceration before he would be eligible for parole. [Child] has been in care for over five years—almost his entire life. His permanency and stability should not be put on hold waiting to see if Father will be released from prison at his earliest release date and prepared for reunification.

Trial Ct. Op., 9/27/22, at 16-18 (formatting altered).

Our review of the record confirms that the trial court's findings are supported by competent, clear, and convincing evidence. *See T.S.M.*, 71 A.3d at 267. Further, we find no error in the trial court's legal conclusions. *Id.* We recognize that Father has been incarcerated for a substantial portion of Child's life, and that there were limitations on Father's ability to remedy his parental incapacity during that time. However, as noted by the trial court, the record reflects that Father failed to make any real efforts towards reunification, either while he was in prison or after his release. *See S.P.*, 47 A.3d at 830. Therefore, the trial court did not abuse its discretion by terminating Father's parental rights to Child pursuant to Section 2511(a)(2). *See C.M.K.*, 203 A.3d at 262. Accordingly, Father is not entitled to relief.

### Section 2511(b)

Father also challenges the trial court's termination under Section 2511(b). However, Father does not address the requirements of Section 2511(b) with any specificity, nor does he make any argument regarding Section 2511(b) in his brief. While we could find Father's claim waived on this basis, we will nonetheless address Child's best interests on appeal. *See In*

- 14 -

*re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (addressing the best interests of the child under Section 2511(b) *sua sponte*).

Section 2511(b) states in relevant part:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child."

*C.L.G.*, 956 A.2d at 1008 (citation omitted). This Court has explained:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted and formatting altered). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-

adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268 (citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). The question is whether the bond between the parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. ***Id.*** at 764. "Section 2511(b) does not require a formal bonding evaluation" and caseworkers may offer their opinions and evaluations of the bond. ***Z.P.***, 994 A.2d at 1121 (citation omitted).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, . . . the result, all too often, is catastrophically maladjusted children." ***T.S.M.***, 71 A.3d at 269. Finally, we reiterate that the court may emphasize the safety needs of the child. ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011).

Here, at the termination hearing, Ms. Jackson's testimony established that Father had seen Child only a handful of times over the last five years, and that they did not share any bond, let alone a parent-child bond. ***See*** N.T. Hr'g, 3/15/22, at 23-25, 31-36, 41. The record also reflects that Child has a healthy, loving parental bond with A.B., and Child calls A.B. "Mom." ***See id.***

- 16 -

at 23-28. Further, Father did not testify regarding the existence of any parental bond with Child and admitted he had never sent him a letter, card, or gift. ***See id.*** at 36-45.

In addressing Child's best interests, the trial court explained:

[Child] would not suffer any irreparable harm if Father's parental rights were terminated. [Child] has been in DHS care since an OPC was obtained in March 2017. He has continuously resided with his current Foster Parent since June 2018 when he was approximately 17 months old. [Child] is now six years old and has spent his entire life outside of the care and control of Father. There was compelling testimony presented at the TPR hearing that [Child] does not know Father as his Father, and he does not have a parent-child bond with him. Furthermore, Father's visits with [Child] continue to be supervised and have never progressed to unsupervised. During the short periods of time when Father was not incarcerated, he did not consistently visit [Child]. Father testified that he could communicate with the outside world as long as he added individuals to his contact list. While one of Father's SCP objectives was to add CUA and [Child] to his contact list, there is no testimony that Father ever did so. Nevertheless, Ms. Jackson made several attempts to arrange virtual visits between Father and [Child] at the prison and help Father establish a relationship with [Child].

In determining the best interest of the child, this court must consider the needs and welfare of the child such as love, comfort, security, and stability. [Child] does not look to Father to meet these needs. Throughout the time [Child] has been in DHS care, Father has never been a parent to [Child] and has never spent any time with [Child] outside of supervised visits. Father has never provided [Child] with care and comfort, nor has he attended to [Child's] medical, emotional, or educational needs. Throughout the time he was incarcerated, Father never sent [Child] any letters, cards, or gifts although CUA case manager provided him with a mailing address. While Father asserts that he wants to be a part of [Child's] life, it is clear that Father is not in a position where [he] is able to be reunified with [Child].

On the contrary, [Child's] foster parent provides him with love, support, care, comfort and stability. [Child] looks to her to meet

- 17 -

his basic needs. Ms. Jackson testified that [Child] shares a parental bond with his foster parent, and described their relationship as "very nurturing." He is well-adjusted in the home and has lived there most of his life. [Child's] Foster Parent [testified that Child] calls her "mom" and she considers him as her child. Additionally, Foster Parent's home is a pre-adoptive home for [Child]. [Child's legal] counsel had the opportunity to observe [Child] in Foster Parent's home. [Child's legal] counsel stated that another child also lives in Foster Parent's home, who [Child] considered his sibling. She stated that while [Child] did not understand the concept of adoption, he considered the Foster Parent and foster-sibling to be his family and home. [Child's legal] counsel indicated that [Child] appeared comfortable, at ease, and bonded with everyone in the home. Ms. Jackson testified that [Child] would suffer irreparable harm if he were removed from Foster Parent's home.

Clear and convincing evidence has been presented to establish that there would be no irreparable harm caused to [Child] if this court terminated Father's parental rights. [Child] deserves permanency and should not wait indefinitely.

Trial Ct. Op., 9/27/22, at 23-25 (formatting altered).

Following our review of the record, we discern no abuse of discretion by the trial court. *See T.S.M.*, 71 A.3d at 267. The record supports the trial court's conclusion that there was no bond between Father and Child, that A.B. fulfills a parental role for Child, and that there would be no irreparable harm to Child if Father's parental rights were terminated. *See K.Z.S.*, 946 A.2d at 764. Accordingly, the trial court did not abuse its discretion in concluding that the termination of Father's parental rights would best serve Child's developmental, physical, and emotional needs and welfare. *See C.L.G.*, 956 A.2d at 1008-10. Therefore, Father is not entitled to relief on this issue.

**Goal Change**

In his final issue, Father contends that the trial court erred in changing Child's permanency goal to adoption. Father's Brief at 22-26. Father contends that the trial court should have considered that Father could have been released from custody as soon as October 23, 2022, and that Child could have continued to reside with his foster parent until that time. *See id.* at 25-26. Father contends that upon release, he would have had the opportunity to build a relationship with Child and demonstrate that the reasons for Child's placement in foster care had been successfully alleviated. *See id.* at 26.

At the outset, we note that Father's challenge to the goal change is moot based on our decision to affirm the order terminating Father's parental rights under Section 2511(a)(2) and (b). *See Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021). In any event, for the reasons stated herein concerning Child's best interests, we discern no abuse of discretion or error of law in the trial court's determination that a goal change to adoption was in Child's best interests. *See* 42 Pa.C.S. § 6351(f) (setting forth the factors for a goal change determination); *In re R.M.G.*, 997 A.2d 339, 345, 347 (Pa. Super. 2010) (noting that "goal change decisions are subject to an abuse of discretion standard of review" and that a child's safety, permanency, and well-being take precedence over all other considerations in a goal change decision (citation omitted)).

Therefore, even if we were to consider Father's challenge to the order changing Child's goal to adoption, we would not disturb the trial court's

determination that Child's need for permanency outweighed Father's hopes to reunify with Child in the future. **See R.M.G.**, 997 A.2d at 347. For these reasons, we affirm the trial court's order.

Decree affirmed. Order affirmed.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/2022